IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

BAMBI L. FAIRCHILD,
      Plaintiff,

vs.                                    Case No.: 3:14cv42/EMT

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,
      Defendant.
_____/

**MEMORANDUM DECISION AND ORDER**

      This case has been referred to the undersigned magistrate judge for disposition pursuant to the authority of 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, based on the parties' consent to magistrate judge jurisdiction (*see* docs. 12, 13).  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act"), for review of a final decision of the Acting Commissioner of the Social Security Administration ("the Commissioner of the SSA") denying Plaintiff's applications for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34, and supplemental security income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381–83.

      Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence and comport with proper legal principles.  Thus, the decision of the Commissioner is affirmed.

I.     PROCEDURAL HISTORY

      On October 22, 2009, Plaintiff protectively filed applications for DIB and SSI, and in each application she alleged disability beginning September 15, 2009 (tr. 19 at 1).[1]  Her applications were denied initially and on reconsideration.  Thereafter, Plaintiff requested a hearing before an

---

[1]  All references to "tr." refer to the transcript of SSA record filed on May 28, 2014 (doc. 15).  In addition, the page numbers cited refer to those found on the lower right-hand corner of each page of the transcript, rather than those assigned by the court's electronic docketing system or any other page numbers that may appear.

administrative law judge ("ALJ").   A hearing was conducted on April 4, 2012, at which Plaintiff—who was represented by counsel—and a vocational expert ("VE") testified.  On June 25, 2012, the ALJ issued a decision in which she found Plaintiff "not disabled," as defined under the Act, at any time through the date of her decision (tr. 19–33).  The Appeals Council subsequently denied Plaintiff's request for review.  Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court.  Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007).  This appeal followed.

II.    FINDINGS OF THE ALJ

In denying Plaintiff's claims, the ALJ made the following findings (*see* tr. 19–33):

(a)    Plaintiff meets the insured requirements of the Act, for DIB purposes, through December 31, 2013[2];

(b)    Plaintiff has not engaged in substantial gainful activity since September 15, 2009, her alleged onset date;

(c)    Plaintiff has the following severe impairments: generalized anxiety disorder, depression, and fibromyalgia.[3]

(d)    Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

(e)    Plaintiff has the residual functional capacity ("RFC") to perform light work, with certain restrictions.[4]

---

[2]  The time frame relevant to Plaintiff's claim for DIB therefore is September 15, 2009 (date of alleged onset), through June 25, 2012 (date of the ALJ's decision), even though Plaintiff is insured for DIB purposes through December 31, 2013.  The time frame relevant to her claim for SSI is October 22, 2009 (date of application for SSI) through June 25, 2012 (date of the ALJ's decision).  See Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005) (indicating that SSI claimant becomes eligible to receive benefits in the first month in which she is both disabled and has an SSI application on file).  Thus, the time frame relevant to this appeal ("the relevant period") is approximately September 2009 through June 2012.

[3]    "Fibromyalgia is a disorder that causes muscle pain and fatigue."   *See* http://www.nlm.nih.gov/medlineplus/fibromyalgia.htm (last visited March 25, 2015).  Patients with this condition have "tender points" [also called "trigger points"], which are specific places on the neck, shoulders, back, hips, arms, and legs that hurt when pressure is applied to them. *Id.* Other symptoms may also be present, including trouble sleeping, morning stiffness, headaches, painful menstrual periods, tingling or numbness in hands and feet, and problems with thinking and memory. *Id.*

[4]  Light work is defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) as follows:

(f)      Plaintiff is unable to perform any of her past relevant work.

(g)      Plaintiff was born on August 13, 1961, and thus she was a "younger person" of forty-eight years on the date she applied for SSI and DIB, though she became a person "closely approaching advanced age" during the relevant period.

(h)      Plaintiff has at least a high school education and is able to communicate in English.

(i)      Transferability of job skills is not material to the determination of disability.  The Medical-Vocational Rules, used as a framework for decision making, support a finding that Plaintiff is "not disabled," whether or not she has transferable job skills.

(j)      In light of Plaintiff's age, education, work experience, and RFC, jobs exist in significant numbers in the national economy that Plaintiff can perform.  Specifically, Plaintiff is able to perform the jobs of assembler of electrical accessories, routing clerk, and office helper.

(k)      Plaintiff has not been under a disability, as defined in the Act, from September 15, 2009, through the date of the ALJ's decision.

---

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

In this case, the ALJ found that Plaintiff could lift and carry up to twenty pounds occasionally and ten pounds frequently; stand or walk thirty minutes at a time and six hours total in an eight-hour workday; sit approximately six hours total in an eight-hour workday; never climb ladders, ropes, or scaffolds; never work at unprotected heights or around dangerous machinery; and occasionally climb stairs, operate foot controls, bend, stoop, kneel, crouch, and crawl (tr. 26).  Additionally, with respect to non-exertional limitations, the ALJ found that Plaintiff should avoid tasks involving a variety of instructions or tasks, but she is able to understand and carry out simple one-to-two step instructions and is able to understand and carry out detailed but uninvolved oral or written instructions involving a few concrete variables in or from standardized situations (*id.*).  She must have minimal changes in work settings or routines and be able to make judgments on simple work-related decisions (*id.*).  Plaintiff could not work in crowds and must have no more than occasional contact with the public (*id.*).

III.    STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987). "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991). As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998); Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995). Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439. The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which

exists in the national economy." *Id.* § 423(d)(2)(A).  Pursuant to 20 C.F.R. § 404.1520(a)–(g),[5] the Commissioner analyzes a disability claim in five steps:

    1.    If the claimant is performing substantial gainful activity, she is not disabled.

    2.    If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

    3.    If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

    4.    If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

    5.    Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her RFC and vocational factors, she is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work.  20 C.F.R. § 404.1512.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  <u>MacGregor v. Bowen</u>, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must then prove she cannot perform the work suggested by the Commissioner.  <u>Hale v. Bowen</u>, 831 F.2d 1007, 1011 (11th Cir. 1987).

## IV.    ISSUES PRESENTED FOR REVIEW

Plaintiff contends that the record evidence does not support the physical or mental RFC assessments on which the ALJ relied in finding she is not disabled (*see* doc. 17 at 1).  According to Plaintiff, this action should be reversed and remanded for further proceedings or, alternatively, remanded for the payment of benefits (*id.* at 22).  The Commissioner responds that the decision denying benefits should be affirmed because it is supported by substantial evidence and was decided according to proper legal standards (doc. 18 at 25).

---

    [5] In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or SSI, but separate, parallel statutes and regulations exist for DIB and SSI claims (*see* 20 C.F.R. §§ 404, 416).  Therefore, citations in this Order should be considered to refer to the appropriate parallel provision.  The same applies to citations of statutes or regulations found in quoted court decisions.

V.      HEARING TESTIMONY AND MEDICAL EVIDENCE

A.      Hearing Testimony

At the April 4, 2012, administrative hearing, Plaintiff testified that she is divorced and lives with her sister and brother-in-law (tr. 46). Plaintiff stated that she is five feet, two inches tall and currently weighs 146–150 pounds (tr. 48); she completed several years of college (tr. 49); and from 1984 until 2004 she worked as an administrative assistant with the Federal Bureau of Investigation ("FBI") (tr. 180, 165–68). Plaintiff quit working for the FBI to care for her mother, who was ill with cancer (tr. 54–55). Plaintiff testified that in addition to her administrative assistant position with the FBI, she has worked briefly as a cashier, security guard, sales clerk, night auditor, hotel clerk, salesperson, and home attendant (tr. 51–54) (*see also* tr. 69–70, VE's testimony).

In response to questioning by the ALJ, Plaintiff stated that she sometimes suffers unbearable pain from her fibromyalgia, including "shooting pain straight up [her] groin," "shooting pains through [her] heart," and "stabbing pains in [her] back" (tr. 56). Her shooting pains occur as often to ten to fifteen times per hour and last from one to five minutes (tr. 58). Plaintiff's medication no longer relieves her fibromyalgia pain (tr. 57), but Excedrin and Advil "work the best" to reduce it (tr. 59). Due to pain, Plaintiff needs to lie down during the day for two to three hours, although she tries to help out around the house by doing the dishes, performing light cleaning, and caring for pets (*id.*). As frequently as three times per week Plaintiff needs to lie in bed all day (tr. 67). Plaintiff indicated that she is able to walk about one-quarter mile and that activity worsens her pain (tr. 60). Plaintiff testified that she could stand for about ten to fifteen minutes at a time and usually has no problems sitting (tr. 61). She is limited to lifting about twenty pounds and can do so not more than once per day (*id.*). Plaintiff's hands hurt, with the pain affecting her grip and causing her hands to shake; the shaking makes it difficult for her to hold a knife and fork (tr. 62). Plaintiff had not yet mentioned this problem to her physicians but she intends to do so (*id.*). Plaintiff has a driver's license and occasionally drives to the Dollar General store to buy small items, although she does not drive to a regular grocery store (tr. 65). During the day, Plaintiff watches television and plays with her dog, but due to pain she usually sits for only about fifteen minutes before needing to rise and become more active by doing such things as working on the laundry (tr. 66).

In addition to fibromyalgia, "severe depression and mental illness" interfere with Plaintiff's ability to work (tr. 57). She takes Klonopin and Cymbalta and attends counseling, both of which measures are helpful (tr. 62–63). Plaintiff has no friends but gets along with others (tr. 63–64). She has problems concentrating, which are related to her difficulty focusing and pain (tr. 64). Plaintiff acknowledged that she had been told she was addicted to a tranquilizer, but she denied having had a substance abuse problem; rather, Plaintiff thought she had suffered two nervous breakdowns (tr. 67). Plaintiff does not drink alcohol or use street drugs (*id.*).

At the conclusion of Plaintiff's testimony the VE testified. The ALJ asked the VE to assume an individual with Plaintiff's work experience who could lift and carry twenty pounds occasionally and ten pounds frequently; had no restrictions on the ability to sit; was restricted to standing and walking no more than thirty minutes at a time and could do so for six hours out of an eight-hour workday; could not climb ladders, scaffolds, and ropes; could not work around unprotected heights or dangerous equipment; could only occasionally climb stairs, operate foot controls, bend, stoop, kneel, crouch, and crawl; must avoid work involving a variety of instructions or tasks but could understand and carry out simple one or two step instructions; could understand and carry out detailed but uninvolved written or oral instructions that contain a few concrete variables in or from standardized situations; must only have minimal changes in work setting and routines; could make judgments only on simple work-related decisions; could not work in crowds; and could have no more than occasional contact with the public (tr. 70–71).

The VE testified that the individual described could not perform any of Plaintiff's past relevant work (tr. 71). When asked if there was other work the individual could perform, specifically light work, the VE indicated that a thirty-minute restriction on standing and walking, along with the social restrictions described by the ALJ, would erode the numbers of jobs available to the individual (tr. 72). Nevertheless, according to the VE, there were three positions that fit the hypothetical worker: electrical components assembler, routing clerk, and office helper (tr. 72–73). If the individual also had to lie down two to three hours per day, however, all of the identified jobs would be eliminated (tr. 74). Upon cross-examination by Plaintiff's counsel, the VE testified that if the individual were limited to only occasional contact with supervisors or co-workers, she would not be able to sustain

the job of office helper (tr. 74–75).  Also, the VE testified that if the individual were unable to sustain a production pace, the position of electrical assembler likely could not be performed (tr. 75).

      B.     Relevant Medical History[6]

Below, the court summarizes the medical evidence from the sources mentioned by Plaintiff in her memorandum, as well as some other record evidence that Plaintiff does not cite.  The court outlines the evidence by medical source and, to the extent practicable, in chronological order.

      (1)     Records Pre-dating the Relevant Period

Plaintiff was treated at Lakeview Center from July 2005 to September 2006 for anxiety disorder, amphetamine abuse, depression, delusional disorder, and psychotic disorder (tr. 530–44). Plaintiff was hospitalized at Lakeview Center in 2006, when she was described as being paranoid and delusional (tr. 535); at that time, she acknowledged having a history of abusing benzodiazepines [Xanax], and it was noted that in the past she had been treated at a detox facility for twenty-eight days (tr. 534).

Plaintiff was treated at West Florida Hospital for a nosebleed in October 2006 (tr. 455–58), and pain associated with fibromyalgia in September 2009 (tr. 450–54).  Also, between March 2008 and January 2009 Michelle S. Jackson, M.D., treated Plaintiff for fibromyalgia, arthralgias, anxiety, insomnia, reflux, otitis, tinnitus, neuritis, and weight loss (tr. 306–11).  In January 2009 Plaintiff's prescribed medications included Klonopin, Ultram, Ambien, and Paxil; Dr. Jackson noted that she thought Plaintiff was "taking too much pain medication from us right now" (tr. 306).  From January 2009 through August 2009 Edward Schnitzer, M.D., of the Coastal Neurological Institute, treated Plaintiff for insomnia, anxiety and depression, low back pain, and fibromyalgia/myositis (tr. 312–26).

      (2)     Records From—and Slightly Before and After—the Relevant Period

West Florida Primary Care

Between July 2009 and February 2010, Plaintiff was seen by physicians at West Florida Primary Care, including Alan D. Neal, M.D., for numerous complaints, among them sinusitis,

---

[6] The court's May 30, 2014, Scheduling Order in part requires the parties to file memoranda in support of their respective positions which specifically cite the record by page number for all factual contentions (doc. 16).  The Scheduling Order cautions that the failure to do so "will result in the contention(s) being disregarded for lack of proper development" (*id.* at 2).  Given these instructions, in this section of the instant Order the court has relied heavily on the parties' memoranda for the factual information that pertains to Plaintiff's claims (*see* docs. 17, 18), in particular Plaintiff's memorandum because she bears the burden of demonstrating that the Commissioner's decision to deny benefits was incorrect.

fibromyalgia, insomnia, fatigue, lower back pain, anxiety, and panic disorder (tr. 327–34).   In December 2009 the examining physician noted Plaintiff's reports of severe head pain and staying in bed all day for several days; he diagnosed influenza and malaise/fatigue (tr. 329).  The physician also noted that in reviewing Plaintiff's records it appeared "she is on a lot of medication for presumed chronic pain" (*id.*).   In January 2010, Dr. Neal noted that he wished to refer Plaintiff to a pain management physician, physiatrist, or rheumatologist to assess whether trigger point injections might be helpful to alleviate Plaintiff's pain (tr. 328).  The following month, February 2010, a West Florida Primary Care physician saw Plaintiff again, on this occasion for a sinus infection (tr. 327).

Edwin E. Taylor, M.D., State Agency Examining Consultant

Dr. Taylor conducted an examination of Plaintiff on March 13, 2010, at the request of the Florida Disability Determination Services ("DDS") (tr. 335– 41).  Dr. Taylor reviewed records "from December from Dr. Neal," who was treating Plaintiff for fibromyalgia, insomnia, fatigue, and panic disorder, and, apparently, from Dr. Schnitzer, who had diagnosed Plaintiff with insomnia, anxiety, depression, fibromyalgia, and myositis (tr. 338).  In his report, Dr. Taylor stated that Plaintiff presented "with the following allegations,  1.  Severe fibromyalgia  2.  Panic attacks, agoraphobia  3. Hearing voices  4. Chronic infections  5.  Depression" (tr. 335).  Plaintiff, a smoker, reported having bronchitis but no other pulmonary symptoms or cardiovascular symptoms (*id.*).  She complained of severe pain in all joints and daily sinus headaches that were relieved by over-the-counter medications (*id.*).  Dr. Taylor noted that Plaintiff reported spending the previous three months in bed due to severe pain all over her body; Plaintiff was not having pain at that time, however, even after sitting for two hours in the reception area waiting to be seen (tr. 336).  Dr. Taylor states there was some "discrepancy in what she is telling us," after noting that although Plaintiff reported she could only walk ten feet, she had walked at least twenty-five feet from her car to his office; Plaintiff also stated that she could sit no more than fifteen minutes total over a period of eight hours and that at home she was always lying down (*id.*).  Additionally, according to Dr. Taylor, Plaintiff reported that she was able to perform household chores, such as sweeping, mopping, vacuuming, and washing dishes (*id.*).  Dr. Taylor's physical examination was largely unremarkable, with the exception of some diffuse abdominal tenderness and, with respect to fibromyalgia signs, the presence of twelve positive trigger

points out of eighteen (tr. 337).[7]  Dr. Taylor stated that Plaintiff's "Mini-Mental Status Exam was 29/30," she reported hearing voices while asleep, and she had normal motor and neurological examinations (tr. 338).

Based on his examination of Plaintiff and review of her records, Dr. Taylor concluded that "[t]here is some credible medical evidence today to support a diagnosis of fibromyalgia.  There is credible medical documentation in her previous history supporting this finding." (*id.*).  Dr. Taylor further stated that he had no credible evidence at that time to support diagnoses of chronic infections, panic attacks, or agoraphobia (though he noted Plaintiff's reported reclusiveness could be related to a diagnosis of agoraphobia).  Dr. Taylor opined that Plaintiff's reported auditory hallucinations could be related to her medications, possible parasomnia, or being awakened by voices on her television while she was sleeping (*id.*).

<u>John F. Duffy, Ph.D., State Agency Examining Consultant</u>

Plaintiff underwent a "Clinical Evaluation with Mental Status" by Dr. Duffy on March 19, 2010, at the request of the DDS (tr. 342–44).  Stating that he found Plaintiff to be adequately reliable during the fifty-minute interview, Dr. Duffy noted Plaintiff's reports concerning the history of her present illness, including that she had suffered from social anxiety since childhood and had fibromyalgia for about five years (tr. 342).  Plaintiff said she experienced so much pain that she could not drive a car, clean the house, go shopping, attend church, bathe daily, or remember to feed her dog; severe pain caused her to stop working and prevented her from returning to work (*see* tr. 342–43).  Plaintiff reported that in the prior month she had lain in bed much of the time due to pain, but she also stated that she "'constantly'" does laundry because her dog has frequent accidents (tr. 343).  Plaintiff further stated that she hears voices in her mind every day, something she just lives with (tr. 342).  A voice had told her that a device had been implanted in her head to track her; and although Plaintiff did not believe that to be true, just to be safe she stayed in the house (tr. 343).  Dr. Duffy noted Plaintiff's past history, including that she had experienced "trouble with benzodiazepines at some point years ago," but he indicated that Plaintiff denied having any history of drug or alcohol abuse (*id.*).  With respect to Plaintiff's mental status, Dr. Duffy opined that Plaintiff displayed adequate immediate

---

[7]  Dr. Taylor also completed a Fibromyalgia Report, which states that pain in eleven out of eighteen tender points on digital palpation is one criterion for diagnosing fibromyalgia (tr. 340).

attention and fairly good concentration but deficient memory with remembering words after a
five-minute delay (*id.*).  Her concentration was fairly good (*id.*).  She was alert, oriented, and
cooperative, with clear speech and intact language functions and appropriate affect (*id.*).  Plaintiff's
thought processes were organized and goal-directed, and her general knowledge was intact (*id.*).
Plaintiff reported having a sleep onset delay, decreased appetite, and irritable mood due to pain  (*id.*).

Dr. Duffy opined that Plaintiff had "auditory hallucinations but no visual hallucinations.  There
are delusional beliefs of a paranoid nature.  There are no obsessions, compulsions, panic symptoms,
suicidal or homicidal ideations." (tr. 343).  Although Plaintiff was fearful of being out in public, "this
seems more related to the paranoia" (tr. 344).  Dr. Duffy's diagnoses were psychotic disorder, not
otherwise specified; pain disorder with both physical and psychological factors; and social anxiety
disorder (*id.*).  Her current Global Assessment of Functioning ("GAF") score was 45.[8]  Dr. Duffy
opined that Plaintiff's "paranoid disorder contributing to the anxiety disorder combined with her pain
disorder markedly interfere with her ability to function at an appropriate pace or with persistence in
social relations or work-related activities.  Her ability to carry out activities of daily living is
compromised by her disorders as well.  Outpatient psychiatric treatment and psychological therapy
are recommended.  The prognosis is guarded." (*id.*).

West Florida Healthcare, Sacred Heart Hospital, and Baptist Health Care Emergency Rooms

Plaintiff was seen at the West Florida Healthcare emergency room on April 6, 2010, for
complaints of abdominal pain, nosebleed, weakness, and a urinary tract infection (*see* tr. 442–47), and
again on April 10, 2010, for chest pain (tr. 436–41).  Plaintiff was hospitalized on April 12–13, 2010,
at West Florida Healthcare for continued complaints of chest pain (tr. 345–64), which had resolved
by the time of discharge after Plaintiff was given Dilaudid and Zofran (tr. 347); her diagnoses were
acute coronary syndrome and fibromyalgia (tr. 345).  Tests—including an electrocardiogram, serial
troponins, and a nuclear stress test—were  negative (*id.*).

Plaintiff presented to the Sacred Heart emergency room on April 15, 2010, again complaining
of chest pain and also a history of anxiety (tr. 365–79).  Electrocardiogram, radiographs, and blood

---

[8] GAF is the overall level at which an individual functions, including social, occupational, academic, and other
areas of personal performance.  Diagnostic and Statistical Manual of Mental Disorders 30–32 (4th ed. 1994) ("DSM-
IV").  It may be expressed as a numerical score.  *Id.* at 32.  A score between 41 and 50 reflects serious symptoms or
any serious impairment in social, occupational, or school functioning.  *Id.*

work were normal, with the exception of a decreased potassium level (tr. 367).  Plaintiff was given Naprosyn and discharged with diagnoses of hypokalemia and atypical chest pain, non-cardiac (tr. 368).

Plaintiff was seen at the Baptist Health Care emergency room the following day, on April 16, 2010, with complaints of pain "everywhere," although she was described as appearing comfortable, in no apparent distress, and without signs of pain (tr. 465).  Serial physical examinations were normal (*id.*).  The clinical assessment was acute pain, and Plaintiff was administered morphine (*id.*).

Plaintiff visited the West Florida Healthcare emergency room the next day, on April 17, 2010 (tr. 405–09), when the clinical impression was atypical chest pain (tr. 409).  Plaintiff requested a psychiatric admission but this was denied as "she does not meet ER admission criteria for psych admission" (tr. 408).  Plaintiff was advised to continue with her medications and to follow up with a physician (tr. 409).  Plaintiff returned to the West Florida Healthcare emergency room a day later, on April 18, 2010, with complaints of anxiety, bizarre behavior, severe pain of "10," and stroke symptoms (tr. 388–89).  Plaintiff requested morphine but was given an oral dose of Ativan (tr. 389).  Plaintiff reported that she was out of Klonopin and could not get more through her primary care physician because it was "too soon" for a refill (tr. 388).  Plaintiff was dispensed enough Klonopin to last approximately one week (tr. 391).  Upon discharge, Plaintiff was noted to be walking around the emergency department, smiling, and eating snacks; she reported her pain level was "0" at that time (tr. 389).

Plaintiff presented again to the Baptist Health Care emergency room three days later, on April 21, 2010, complaining of leg numbness and dehydration and feeling as if she were about to have a seizure (tr. 480, 485).  Her family reported that she was out of Klonopin and that she had recently been treated for Ativan withdrawal (*id.*).  Plaintiff did not obtain treatment and left the emergency room without notifying hospital staff (tr. 479).  On April 25, 2010, Plaintiff returned to the Baptist Health Care emergency room with "multiple vague complaints" but primarily all-over pain (tr. 488).  She was given morphine and diagnosed with generalized pain (tr. 485, 488).

Kaberi Samanta, M.D., Treating Psychiatrist

On April 22, 2010, Dr. Samanta, a psychiatrist at Lakeview Center, examined Plaintiff and noted Plaintiff's reports of being socially isolated and withdrawn; lacking energy; and feeling sad,

depressed, overwhelmed, and anxious (*see* tr. 529).   Plaintiff denied any auditory or visual hallucinations, suspiciousness, or paranoia (*id.*).   Plaintiff appeared somewhat evasive and guarded, and Dr. Samanta thought she "might have some hint of some paranoia there that she denies at this time. Cognitively, she is intact." (*id.*).   Plaintiff's affect was flat and constricted and there was some psychomotor retardation (*id.*).   Plaintiff admitted having a history of Xanax abuse in the past and being in rehab; she also informed Dr. Samanta that she was not taking Klonopin at that time (*id.*). Dr. Samanta diagnosed Plaintiff with major depressive disorder, recurrent, with psychosis; generalized anxiety disorder; and panic disorder, without agoraphobia (*id.*).   She advised Plaintiff to increase her Paxil; prescribed Seroquel for insomnia and paranoia, as well as Vistaril for episodic anxiety; and referred Plaintiff for counseling (*id.*).   Dr. Samanta estimated Plaintiff's GAF score to be 45 at that time (*id.*).

### David LeMay, M.D., Examining Physician

Dr. LeMay, a pain management specialist, examined Plaintiff on April 29, 2010, for evaluation of polyarthralgias (tr. 506–08).   Plaintiff informed Dr. LeMay that she had been to the emergency room twice in the past six months (tr. 506).   Dr. LeMay noted that Plaintiff complained of pain in multiple areas of her body over the prior year and that her current medications included Ativan, Tofranil, Lyrica, and Paxil (*id.*).   Dr. LeMay's physical examination revealed multiple positive trigger points, although Plaintiff also had good range of motion in the cervical spine, good lumbar flexion and extension, intact sensation, excellent motor strength, and a negative straight leg raising test (tr. 506–07).   Dr. LeMay's impression was polyarthralgias and likely fibromyalgia (tr. 507).   He recommended that Neurontin and Ultram be added to Plaintiff's medication regimen and her blood work be rechecked; he also advised her to take over-the-counter supplements, undergo electrodiagnostic testing, and start pool therapy (*id.*).

### Jason Cooper, Ph.D., State Agency Non-Examining Consultant

Dr. Cooper prepared a mental RFC assessment and psychiatric review technique form ("PRTF") for Plaintiff dated May 6, 2010 (tr. 509–12, 513–26).   In his PRTF, Dr. Cooper referenced the mental status evaluation conducted by Dr. Duffy on March 18, 2010 (tr. 525).   Dr. Cooper opined that Plaintiff suffered from a psychotic disorder, not otherwise specified (tr. 515); social anxiety disorder (tr. 518); and pain disorder with both physical and psychological factors (tr. 519). Plaintiff's

disorders caused mild limitations with respect to activities of daily living and the ability to maintain concentration, persistence, or pace (tr. 523), and moderate limitations with respect to maintaining social functioning; also, Plaintiff had experienced episodes of decompensation of extended duration on one occasion, following the death of her mother (tr. 523, 525).  Dr. Cooper's mental RFC reflected that Plaintiff was not significantly limited in sixteen areas, was moderately limited in five areas, and had no marked limitations in any areas.[9]  As noted below, but in pertinent part here, Dr. Cooper found that Plaintiff's ability to understand, remember, and carry out detailed instructions was impaired (tr. 511).  In addition, her ability to work in close proximity to others, to interact with the general public, and respond appropriately to criticism was impaired (*id.*).  Summarizing his RFC findings, Dr. Cooper opined that Plaintiff retained the ability to perform simple, repetitive tasks in spite of the noted limitations and could meet the demands of work on a sustained basis despite her medically determined impairments (*id.*).

---

[9]  More specifically, Dr. Cooper opined that Plaintiff was not significantly limited with respect to the ability to remember locations and work-like procedures; understand, remember, and carry out very short and simple instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual; sustain an ordinary routine; make simple work-related decisions; complete a normal workday and workweek; ask simple questions or request assistance; get along with co-workers or peers; maintain socially appropriate behavior; respond appropriately to changes in the work setting; be aware of normal hazards; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others (tr. 509–10).  Plaintiff was moderately limited with respect to the ability to understand, remember, and carry out detailed instructions; work in coordination with or proximity to others; interact appropriately with the general public; and accept instructions and respond appropriately to criticism from supervisors (*id.*).

Dr. Samanta's June 2010 Examination

Following her April  22, 2010, visit to Dr. Samanta, Plaintiff next saw Dr. Samanta on June 8, 2010, when Plaintiff reported she had been admitted to Baptist Hospital on April 25, 2010, and discharged on April 28, 2010 (tr. 527).  Dr. Samanta described Plaintiff as being "alert, cooperative and pleasant" (*id.*).  Plaintiff denied having any hallucinations, suspiciousness, or paranoia; Plaintiff attributed her current mental status to the effectiveness of the combination of medications she was taking (*id.*).  Dr. Samanta noted that Plaintiff was bright and cheerful and presented herself well (*id.*).  Dr. Samanta assessed Plaintiff's GAF score as being 55 to 60 at that time (*id.*).[10]

Anju Garg, M.D., Treating Physician

Plaintiff was treated at the Affordable Medical Clinic, from June 21, 2010, through October 17, 2011, either by Dr. Garg or a physician's assistant working under the supervision of Dr. Garg (*see* tr. 556–98).  Plaintiff's assessment in June 2010 included Reynaud's phenomenon,[11] myalgia, hyperlipidemia, fibromyalgia, nasal cyst on right side of septum, insomnia, depression, and anxiety (tr. 598).  On a ten-point scale, with "10" being the most severe pain, Plaintiff reported a pain level of "10" (*id.*).  Plaintiff's physical examination was unremarkable[12] (*id.*).

Plaintiff was seen twenty-five additional times at the Affordable Medical Clinic, and on each occasion she was assessed with the same conditions (*see* tr. 556, 558, 560, 561, 563, 564, 566, 568, 570, 572, 573, 575, 577, 578, 580, 582, 584, 586, 588, 590, 592, 593, 594, 596, 597).[13]  At these visits Plaintiff frequently reported having pain at a level of "7" or above, and she never reported pain

---

[10]  A GAF score between 51 and 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).  DSM–IV at 32.

[11]  Reynaud's (or Raynaud's) phenomenon or syndrome is "a condition in which cold temperatures or strong emotions cause blood vessel spasms that block blood flow to the fingers, toes, ears, and nose."  *See* http://www.nlm.nih.gov/medlineplus/ency/ article/000412.htm (last visited March 25, 2015).

[12]  The physical examination included assessment of the head, eyes, ears, nose, pharynx, neck, heart, abdomen, muscular system, neurological system, and skin (tr. 598).

[13]  At some of her visits, Plaintiff was also assessed with sinusitis or swelling of the left nostril, hypertension, a nasal tumor of the right nostril that had been removed three years prior, right lower quadrant pain, and/or right ankle sprain (*see* tr. 556, 558, 560, 561, 563, 564, 566, 568, 570, 572, 573, 575, 577, 578, 580, 582, 584, 586, 588, 590, 592, 593, 594, 596, 597).

of less than "5" in intensity (*id.*).  Most of Plaintiff's physical examinations throughout this time were unremarkable (*id.*).  Over the course of her care at the Affordable Medical Clinic, Plaintiff was prescribed numerous medications for pain, anxiety and depression, and infection, including Klonopin, Neurontin, doxycycline, Ultram, Lexapro, Amoxyl, Cymbalta, Cipro, Tylenol #3, and Celexa (*see id.*). In  January 2011, Plaintiff reported to Dr. Garg that Klonopin helped her "a lot" (tr.  584).  In July 2011, Plaintiff reported that Ultram was no longer controlling her pain, so Dr. Garg increased the dosage slightly and changed her to Tylenol #3 (tr. 566).  In October 2011—Plaintiff's final visit to Dr. Garg—it was noted that on a one-time basis only Plaintiff would be permitted to increase the quantity of narcotic pain medication and Klonopin, following which Plaintiff would be returned to her regular, lower dose; also, in the future Plaintiff would have to bring her medication bottles with her to her appointments (tr. 556).

Sharmishtha Desai, M.D., State Agency Non-Examining Consultant

Dr. Desai evaluated Plaintiff's medical records and completed a physical RFC for Plaintiff on August 19, 2010 (tr. 545–52).  Dr. Desai opined that Plaintiff could lift and carry up to twenty pounds occasionally and ten pounds frequently; stand and/or walk about six hours total in an eight-hour workday; and sit approximately six hours in an eight-hour workday (tr. 546).  Plaintiff's ability to push and/or pull was unlimited (other than with respect to her limitations on lifting and carrying) (*id.*).  She could frequently climb stairs and occasionally climb ladders but she could never climb ropes or scaffolds (tr. 547).  Her ability to balance was unlimited and she could frequently kneel, crouch, and crawl (*id.*). Plaintiff had no manipulative, visual, or communicative limitations (tr. 548–49).  With respect to environmental limitations, Plaintiff must avoid concentrated exposure to extreme cold and extreme heat, humidity, vibration, fumes, and hazards such as machinery and heights (tr. 549).  She had no environmental limitations with respect to exposure to wetness or noise (*id.*).

Maxine Ruddock, Ph.D., State Agency Non-Examining Consultant

Dr. Ruddock prepared a one-page Case Analysis for Plaintiff on August 31, 2010, in which she referenced Dr. Samanta's April 2010 and June 2010 treatment notes and Dr. Cooper's May 2010 mental RFC assessment and PRTF (tr. 553, relying on tr. 527–29 and tr. 509–12, 513–26). Concluding her report, Dr. Ruddock stated, "I have reviewed all the evidence in the file and the PRTF and M[ental]RFC of 5/06/10 are affirmed as written." (tr. 553).

<u>Lakeview Center Records After June 2010</u>

There appear to be no other mental health treatment records from Lakeview Center for Plaintiff after June 2010.  Between January 2011 to March 2011, however, Plaintiff contacted Lakeview Center several times by telephone to request counseling services and medication for occasional panic attacks (tr. 608–13).

<u>Dr. Samanta's February 3, 2011, Mental RFC Questionnaire</u>

Dr. Samanta completed a Mental RFC Questionnaire for Plaintiff on February 3, 2011 (*see* tr. 554–55).  Dr. Samanta indicated that Plaintiff had first suffered the limitations at the indicated level of severity in April 2010 (tr. 555).  Plaintiff's diagnoses were major depressive disorder, recurrent without psychosis; generalized anxiety disorder; panic disorder, without agoraphobia; and history of substance abuse (*id.*).  Dr. Samanta opined that Plaintiff experienced moderate restriction in performing activities of daily living, marked difficulty in maintaining social functioning, and moderate deficiencies of concentration, persistence, or pace resulting in the failure to complete tasks in a timely manner (tr. 554).  With respect to whether Plaintiff had experienced episodes of deterioration or decomposition in a work setting, Dr. Samanta noted  "unknown, client doesn't work" (*id.*).  In a routine work setting, on a sustained basis, Plaintiff was moderately limited with respect to understanding, carrying out, and remembering instructions; responding appropriately to supervision; responding appropriately to co-workers; and performing repetitive tasks (*id.*).  According to Dr. Samanta, Plaintiff was mildly limited in the ability to perform simple tasks (*id.*).  <u>Dr. Schnitzer's Treatment Records from October 2011 through August 2012</u>

In October 2011, Dr. Schnitzer noted Plaintiff's complaints of pain, apparently in the neck, hands, back, legs, and feet, and her report that she was being followed by another physician for fibromyalgia (tr. 599).  Dr. Schnitzer's impressions included fibromyalgia/myositis, unchanged; anxiety and depression, unchanged; and long-term use of medications (tr. 601).  He recommended the use of several medications, exercise, and heat/ice as needed (*id.*).  Dr. Schnitzer saw Plaintiff again in February 2012 on follow-up (tr. 604).  Plaintiff's chief complaint at that time was diffuse pain, which  she  reported  was  controlled  overall  (*id.*).    Dr. Schnitzer's  impressions  included fibromyalgia/myositis and management of long-term use of medications, both unchanged, and he recommended continued use of medications and home care (tr. 606). Dr. Schnitzer's impressions at Plaintiff's next visit, in May 2012, included fibromyalgia/myositis, unchanged; anxiety and depression,

unchanged; and management of long-term medication use;  he recommended continuing with her medications and home care (tr. 616–17).

VI.     DISCUSSION

Plaintiff's two arguments for reversal—that the ALJ's physical RFC assessment is not supported by the evidence and that her mental RFC assessment is not supported by the opinions of her physicians or the evidence as a whole (*see* doc. 17 at 1)—consist of several loosely presented sub-arguments.  The court understands the contours of these sub-arguments to be as follows.  With respect to the physical RFC assessment, the ALJ erred in failing to include in the assessment or in the hypothetical questions presented to the VE: (1) all of the environmental limitations identified by Dr. Desai, whose opinion the ALJ otherwise credited, or to explain the exclusion of the limitations; and (2) any functional limitations concerning the use of Plaintiff's hands due to Reynaud's syndrome, the degree of pain resulting from Plaintiff's fibromyalgia, or her need to lie down two to three hours per day.  With respect to the mental RFC assessment, Plaintiff contends the ALJ erred by rejecting the opinion of treating psychiatrist Dr. Samanta while relying on the opinions of non-examining consultants Dr. Cooper and Dr. Ruddock, who reviewed only an incomplete record.  Moreover, the ALJ improperly gave little weight to the opinion of examining psychologist Dr. Duffy and failed to consider all of the functional limitations recommended by Dr. Cooper and Dr. Ruddock.

Physical RFC Assessment

The Eleventh Circuit has noted that the focus of any RFC assessment is on the doctors' evaluations of a claimant's condition and the resulting medical consequences.  Lewis, 125 F.3d at 1440.  An ALJ must consider and evaluate every medical opinion received.  20 C.F.R. § 404.1527.  The ALJ is not bound by the opinion of a state agency consultant.  20 C.F.R. § 404.1527(e)(2)(i).  Nevertheless, the ALJ must evaluate the opinion of a non-examining source and explain the weight given to it. Social Security Ruling ("SSR") 96–6p 1996 WL 374180, at *2 (S.S.A.).  Additionally, hypothetical questions posed by the ALJ to the VE to determine whether an individual with the same limitations as the claimant would be able to secure employment in the national economy must include all of the claimant's impairments that the ALJ finds are supported by the record.  *See* McSwain v. Bowen, 814 F.2d 617, 620 n.2 (11th Cir. 1987).  Here, although the ALJ assigned Dr. Desai's opinion "good" weight, she failed to include in the physical RFC assessment or hypothetical questions posed to the VE all of the environmental limitations suggested by Dr. Desai (including that Plaintiff should

avoid concentrated exposure to extreme cold, extreme heat, humidity, vibration, and pulmonary irritants) or explain her reasons for failing to do so.  According to Plaintiff, her Reynaud's syndrome, which Dr. Garg consistently diagnosed, "would affect the ability of [Plaintiff] to be exposed to both stress and cold, and in all probability played a part in the assessment of Dr. Desai that [Plaintiff] would be required to avoid concentrated exposure to cold." (doc. 17 at 7).  Moreover, Plaintiff contends, Dr. Schnitzer referenced Plaintiff's complaints relating to her hands, as well as her legs and feet, and the assessment from Dr. Taylor indicates a history of bronchitis (*id.* at 6–7).  Plaintiff submits that had the ALJ included the environmental restrictions suggested by Dr. Desai, "the vocational expert may have indicated that, given those additional limitations, the remaining occupational base would be so eroded that no significant number of jobs would be available" (*id.* at 12).

First, Plaintiff's argument is highly—and unacceptably—speculative.  Second, even if the ALJ erred by failing to state with particularity a rationale for not applying all of Dr. Desai's environmental restrictions, which the court doubts, the error was harmless.  *See* Diorio v. Heckler, 721 F.2d 726, 728 (11th Cir. 1983) (applying the harmless error doctrine to a social security appeal).  "The problem for [Plaintiff] is that [concentrated exposure to extreme cold, extreme heat, humidity, vibration, and pulmonary irritants] is not required for any of the jobs the ALJ found [Plaintiff] could perform."  Timmons v. Comm'r of Soc. Sec., 522 F. App'x 897, 906 (11th Cir. 2013) (unpublished) (finding harmless error in ALJ's omission from RFC assessment a restriction imposed by physician whose opinion ALJ assigned great weight because none of jobs cited by ALJ required the restriction).  Here, none of the jobs the ALJ found Plaintiff could perform require any of the environmental restrictions noted by Dr. Desai but excluded from the physical RFC assessments and questions presented to the VE.  *See* tr. 32, and Dictionary of Occupational Titles, 729.687–010 (assembler of electrical accessories), 1991 WL 679733; 222.587-038 (router), 1991 WL 672123; and 239.567-010 (office helper), 1991 WL 672232.  Accordingly, even if the omission of some of Dr. Desai's environmental limitations was error, the error was harmless.  This argument therefore fails.

Plaintiff also complains that the ALJ erred by failing to include in her physical RFC assessment and the questions posed to the VE any functional limitations concerning the use of her hands due to Reynaud's syndrome, a condition which Dr. Garg repeatedly diagnosed.  As previously noted above (*see* n.11, *supra*), Reynaud's syndrome may affect the fingers, toes, ears, and nose. Plaintiff, however, does not identify in Dr. Garg's medical records—or in other medical records—any

references that might support a finding that Plaintiff was significantly limited in the use of her hands (or had problems with her toes, ears, and nose) from Reynaud's syndrome.  Nor did the court locate any such references.  In fact, it appears that most of Plaintiff's physical examinations by Dr. Garg were largely unremarkable (*see* tr. 556, 558, 560, 561, 563, 564, 566, 568, 570, 572, 573, 575, 577, 578, 580, 582, 584, 586, 588, 590, 592, 593, 594, 596, 597, 598), with the only mention of Reynaud's syndrome seeming to be the recurring diagnosis, unaccompanied by the basis for the diagnosis or any functional limitations associated with it.  In short, Plaintiff has failed to show error by the ALJ with respect to her consideration of any functional limitations of her hands resulting from Reynaud's syndrome.

Plaintiff has also failed to show error in the ALJ's consideration of the degree of pain she suffers as a result of fibromyalgia or alleged need to lie down up to three hours per day, based either on the medical record or Plaintiff's own testimony.  As an initial matter, and apparently in contradiction to Plaintiff's understanding, the diagnosis of fibromyalgia is not at issue in this case, as the ALJ found at step two of the sequential analysis that Plaintiff suffers from the condition (tr. 21, citing records from West Florida Primary Care, Dr. LeMay, Dr. Garg, and Dr. Schnitzer).  Rather, what is at issue here is the impact of Plaintiff's fibromyalgia upon her ability to work.  *See* Moore, 405 F.3d at 1213 n.6 (diagnosis alone does not establish that a condition causes functional limitations).  And here, the evidence does not support a finding of significant functional limitations due to fibromyalgia.

At his March 2010 examination, although he noted the presence of positive trigger points indicative of fibromyalgia, Dr. Taylor did not offer an opinion regarding the severity of Plaintiff's fibromyalgia or identify any functional limitations that should be imposed on Plaintiff.  Indeed, contrary to Plaintiff's contention otherwise (doc. 17 at 22), the description that the disease was "severe" was Plaintiff's when she presented her medical history, not Dr. Taylor's (tr. 335).  Dr. LeMay examined Plaintiff in April 2010, when he, as had Dr. Taylor, found multiple positive trigger points.  Dr. LeMay also noted that Plaintiff's range of motion in the cervical spine was good, lumbar flexion and extension were good, sensation was intact, motor strength was excellent, and straight leg raising was negative (tr. 506–07).  Dr. LeMay likewise did not note any functional limitations that Plaintiff required, and he did not characterize her fibromyalgia as being severe in degree.  Nor does Plaintiff argue or show that Dr. Garg, Dr. Schnitzer, or physicians from West Florida Primary Care

did so.  Plaintiff in fact does not correctly identify where in the record a diagnosis by a treating or examining physician of *severe* fibromyalgia may be located, much less where a treating or examining physician recommended functional limitations due to severe pain, and the court is aware of none. With respect to Plaintiff's assertions of reduced hand/grip strength, the court notes that Plaintiff does not point to any references in the record reflecting this problem.  To the contrary, the only information appears to indicate otherwise.  For example, the report of Dr. Taylor's March 2010 consultative examination reflects that Plaintiff's grip strength was 5/5, or normal (tr. 337).  Also, in October 2011, when Plaintiff's complaints included hand pain, Dr. Schnitzer found normal strength of the upper and lower extremities, with no mention of any reduced grip strength of the hands (tr. 599).  Moreover, at the April 2012 hearing Plaintiff acknowledged that as of that date she had not reported to a physician that her hands shook or her grip strength was decreased due to pain (*see* tr. 52, 62).  In sum, as outlined above, the medical record simply does not support a finding that Plaintiff's fibromyalgia was severe in degree or imposed significant functional limitations due to associated pain.

Plaintiff apparently contends that her subjective testimony, by itself, is sufficient to support her claim that she suffers from disabling pain due to severe fibromyalgia.  The court agrees that in some cases subjective pain testimony alone may be enough to support such a claim, as fibromyalgia "often lacks medical or laboratory signs, and is generally diagnosed mostly on a[n] individual's described symptoms," with the "hallmark" of fibromyalgia being "a lack of objective evidence."  Moore, 405 F.3d at 1211.  This, however, is not such a case, as Plaintiff's subjective testimony is  not, as the ALJ found, entirely credible.

In Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991), the court articulated the "pain standard," which applies when a disability claimant attempts to establish a disability through her own testimony of pain or other subjective symptoms.  The pain standard requires:  (1) evidence of an underlying medical condition and either (a) objective medical evidence that confirms the severity of the alleged pain arising from that condition, or (b) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.  Holt, 921 F.2d at 1223 (internal citation omitted).  If a claimant testifies as to her subjective complaints of disabling pain and other symptoms, as Plaintiff did here, the ALJ must clearly "articulate explicit and adequate reasons" for discrediting the claimant's allegations of completely disabling symptoms.  Foote, 67 F.3d at 1561–62.  Additionally, "'[a]lthough this circuit does not require an explicit finding as to

credibility, . . . the implication must be obvious to the reviewing court.'"  *Id.* at 1562 (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983)).  The credibility determination does not need to cite "'particular phrases or formulations,'" but it cannot merely be a broad rejection which is "'not enough to enable [the court] to conclude that [the ALJ] considered her medical condition as a whole.'"  *Id.* (quoting Jamison v. Bowen, 814 F.2d 585, 588–90 (11th Cir. 1987)).

In this case, the ALJ set forth the relevant pain standard (tr. 26) and then stated she found Plaintiff's credibility to be undermined by certain inconsistent statements Plaintiff made to her physicians and at the administrative hearing, as well as evidence of what appeared to be drug-seeking behavior (tr. 29, 30).  The cited statements include Plaintiff's report to pain management specialist Dr. LeMay on April 29, 2010, that she had been to an emergency room only twice in the prior six months (tr. 506), when in fact that very month alone Plaintiff had presented to emergency rooms on nine occasions, at which time she had been given narcotic medications for pain such as Dilaudid and morphine and had been dispensed Klonopin (tr. 347, 391, 465, 485, 488).  The ALJ also noted Plaintiff's report to her psychiatrist, Dr. Samanta, on June 8, 2010, that she had been admitted to the hospital from April 25 to April 28, 2010, but this is not accurate as the record reflects Plaintiff was seen at the Baptist Hospital emergency room and discharged the same day, April 25 (tr. 485, 488).  Moreover, Plaintiff apparently made no mention of the April 25 emergency room visit to Dr. LeMay when she saw him just a few days later, on April 29, 2010 (tr. 506–08).  In addition, the ALJ contrasted Plaintiff's testimony at the hearing that she did not have much difficulty sitting and that activity worsened her pain (tr. 61) with her additional testimony that she was only able to sit for ten to fifteen minutes before needing to rise and move about in order to alleviate her pain (tr. 66).  Plaintiff also testified that her hands shook and her grip strength was diminished (tr. 52, 62), yet she had never reported these symptoms to any physician (tr. 62), and there was no medical evidence of these symptoms.  The ALJ also noted that Plaintiff testified she needed to spend up to three days per week in bed due to pain (tr. 67) [and reported to examining physician Dr. Taylor and examining psychologist Dr. Duffy that she had spent up to three months in bed due to pain (tr. 336, 343)], but the only time Plaintiff reported such an extreme degree of incapacitation to a treating physician was in December 2009 when she was suffering from influenza and a sinus infection (tr. 329).[14]

---

[14]  The ALJ also concluded that Plaintiff's reported ability to perform such activities as sweeping, cleaning, and doing laundry were consistent with the physical RFC assessment, which implies the activities were not consistent

With regard to what the ALJ described as Plaintiff's drug-seeking behavior, which she found also undermined Plaintiff's credibility,[15] the ALJ noted that Plaintiff had recently tested positive for benzodiazepines despite there being no evidence that this type of drug was currently being prescribed for Plaintiff (*see* tr. 30, 602–03). Also, at Plaintiff's April 18, 2010, emergency room visit to West Florida Healthcare it was noted that her primary care physician would not renew a prescription for Klonopin because it was "too soon" for a refill (tr. 388); the emergency room physician nevertheless dispensed approximately one weeks' worth of Klonopin to Plaintiff (tr. 391). Only three days later, however, at her April 21, 2010, emergency room visit to the Baptist Health Care emergency room, Plaintiff was again out of the medication (tr. 480); it also appears that, inexplicably, she left the hospital without receiving treatment or notifying hospital staff (tr. 483). The ALJ also noted that Plaintiff discontinued treatment with Dr. Garg after she told Plaintiff she would briefly increase the quantity of Plaintiff's narcotic pain medication and Klonopin, but after that Plaintiff must resume her lower dose and would have to bring her medication bottles with her to future appointments (tr. 556). Moreover, when the ALJ asked Plaintiff at the administrative hearing about her history of substance abuse, Plaintiff stated she had no such problem but rather, in her view, had suffered two nervous breakdowns; she also failed to mention that she had spent twenty-eight days in a rehab facility for treatment of substance abuse (tr. 66–67, 528).

Based on the foregoing, the court is satisfied that the ALJ's finding that Plaintiff's subjective pain testimony is not fully credible reflects consideration of Plaintiff's medical condition as a whole and is supported by substantial evidence. The ALJ's credibility finding therefore should not be disturbed.

In summary, the court concludes that the ALJ did not err by failing to include all of the environmental limitations identified by Dr. Desai in the physical RFC assessment or the hypothetical questions posed to the VE. Nor did the ALJ err in her consideration of any functional limitations involving Plaintiff's use of her hands due to Reynaud's syndrome, pain from fibromyalgia, or asserted

---

with the severe limitations also claimed by Plaintiff (tr. 30).

[15] *See* Douglas v. Comm'r of Soc. Sec., 486 F. App'x 72, 75 (11th Cir. 2012) (holding that ALJ may consider plaintiff's drug-seeking behavior when evaluating the credibility of subjective complaints).

need to lie down two to three hours per day.  Accordingly, Plaintiff's first argument in support of reversal is without merit.

    Mental RFC Assessment

    Substantial weight must be given to the opinion, diagnosis, and medical evidence of a treating physician unless there is good cause to do otherwise.  *See* Lewis, 125 F.3d at 1439–1441; 20 C.F.R. § 404.1527(d).  "'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  Phillips v. Barnhart, 357 F.3d 1232, 1240–41 (11th Cir. 2004) (citation omitted).  Thus, an ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  But, if an ALJ elects "to disregard the opinion of a treating physician, the ALJ must clearly articulate [her] reasons" for doing so.  *Id.* at 1241; *see also* Edwards, 937 F.2d 580 (finding that the ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).  Although the ALJ has wide latitude to evaluate the weight of the evidence, she must do so in accordance with prevailing precedent.  Pursuant to the regulations, the weight an ALJ must give medical opinions varies according to the relationship between the medical professional and the claimant.  20 C.F.R. § 404.1527(c).  For example, treating physicians' opinions receive more weight than the opinions of non-treating physicians, the opinions of examining physicians are generally given more weight than non-examining physicians, and specialists' opinions on issues within their areas of expertise receive more weight than non-specialists' opinions.  *See id.*; Preston v. Astrue, No. 2:09-cv-0485-SRW, 2010 WL 2465530, at *6 (N.D. Ala. June 15, 2010).  With respect to non-examining State agency medical consultants or other program physicians, the regulations explain that an ALJ is required to consider their opinions because they "are highly qualified physicians . . . who are also experts in Social Security disability evaluation."  20 C.F.R. § 404.1527(e)(2)(i).  An ALJ may rely on opinions of non-examining sources when they do not conflict with those of examining sources.  Edwards v. Sullivan, 937 F.2d 580, 584–85 (11th Cir. 1991).  Where the ALJ has discounted the opinion of an examining source properly, however, the ALJ may rely on the contrary opinions of non-examining sources.  *See* Milner v. Barnhart, 275 F. App'x 947 (11th Cir. 2008) (unpublished) (where ALJ rejected conflicting opinion

of one-time examining physician properly, ALJ did not err by giving substantial weight to the opinions of non-examining physicians).

Plaintiff initially complains that the ALJ erroneously stated there are no medical opinions of record that conflict with her mental RFC assessment (doc. 17 at 15). Plaintiff points out that in her Mental RFC Questionnaire Dr. Samanta opined that Plaintiff had a "marked" limitation with regard to social functioning and thus her opinion in fact conflicts with the ALJ's assessment, which found only a "moderate" limitation in this category (*id.*). Plaintiff misreads the ALJ's decision. When the ALJ stated there were "no conflicting medical opinions in the record," she was referring to Plaintiff's physical RFC assessment, not her mental RFC assessment (*see* tr. 31, finding no conflicting opinions with physical RFC assessment after discussing Dr. Desai's opinion that Plaintiff was capable of performing a reduced range of light work). Plaintiff's contention therefore is without basis.

Turning to Plaintiff's argument concerning treating psychiatrist Dr. Samanta, the court notes that Dr. Samanta, in large part, completed her Mental RFC Questionnaire by circling single-word responses on a pre-printed form and providing no supporting narrative. Pre-printed forms do not provide persuasive evidence of the validity of the opinions expressed therein. *See, e.g.*, Hammersley v. Astrue, No. 5:08cv245–Oc–10GRJ, 2009 WL 3053707, at *6 & n.35 (M.D. Fla. Sept. 18, 2009) ("check-off forms . . . have limited probative value because they are conclusory and provide little narrative or insight into the reasons behind the conclusions") (citing Spencer ex rel. Spencer v. Heckler, 765 F.2d 1090, 1094 (11th Cir. 1985) (rejecting opinion from a non-examining physician who merely checked boxes on a form without providing any explanation for his conclusions); Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993) (noting that "[f]orm reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best.")). *See also* 20 C.F.R. 404.1527(c)(3) ("The better an explanation a source provides for an opinion, the more weight we will give that opinion."). Stated another way, opinions on pre-printed forms are merely conclusory, and it is entirely proper for an ALJ to reject a treating physician's opinion on such a basis. Accordingly, in this case the ALJ was entitled to discount Dr. Samanta's opinion for the reason she stated in the decision: Dr. Samanta failed to provide a narrative explaining why Plaintiff had a "marked" limitation in social functioning. Moreover, as the ALJ also concluded, a "marked" limitation in social functioning appears to be inconsistent with Dr. Samanta's June 8, 2010, treatment notes, in which she described Plaintiff as being "alert, cooperative and pleasant," appearing bright and cheerful, and

presenting herself well (tr. 31, 527).  Also, importantly, Dr. Samanta assessed Plaintiff's GAF score as being 55 to 60 (*id.*), which reflected only "moderate" symptoms.[16]

For the foregoing reasons, the court concludes that the ALJ articulated an adequate basis for refusing to accept that part of Dr. Samanta's February 2011 Mental RFC Questionnaire in which she opined that Plaintiff had a "marked" restriction in social functioning.  The ALJ therefore did not err in discounting Dr. Samanta's finding.

Plaintiff also complains that Dr. Cooper and Dr. Ruddock performed their reviews on a less-than-complete record.  The ALJ noted that additional evidence had been submitted after these consultants wrote their reports, but she reviewed the evidence and found it did not support mental limitations any greater than they had assessed (tr. 31).

It is true, of course, that Dr. Cooper did not have the benefit of examining records created after the date of his May 2010 report.  In her August 2010 report, however—in which she fully endorsed Dr. Cooper's findings—Dr. Ruddock reviewed Dr. Samanta's June 2010 note, which indicated Plaintiff's mental status had improved.  Furthermore, although Dr. Samanta completed her Questionnaire in February 2011, the administrative file appears to contain no additional psychiatric treatment records after June 2010 showing that Plaintiff underwent mental health examinations or received any significant psychiatric care—whether from Lakeview Center and Dr. Samanta, Dr. Garg, or Dr. Schnitzer, as mentioned previously (*see* n.16, *supra*).  For the purpose of Dr. Ruddock's assessment in August 2010, the court therefore concludes that the record of Plaintiff's psychiatric care appears to have been substantially, and adequately, complete.

The court further concludes that the ALJ did not commit reversible error in considering the March 2010 report of examining psychologist Dr. Duffy, who assessed Plaintiff with psychotic disorder (tr. 23).  According to Dr. Duffy, Plaintiff's paranoid disorder contributed to her anxiety disorder which, when combined with her pain disorder, markedly interfered with her ability to

---

[16]   Furthermore, the court notes that although there are records from Lakeview Center between January and March 2011 reflecting sporadic telephone contacts and medication requests (tr. 608–13); from Dr. Garg between June 2010 and October 2011 showing routine medication refills for such drugs as Klonopin, Paxil, and Cymbalta (tr. 556–98); and from Dr. Schnitzer between October 2011 and May 2012 briefly mentioning diagnoses of anxiety and depression (tr. 599–617), there is no evidence that Plaintiff received any substantive psychiatric evaluations or psychiatric treatment after June 2010.  Moreover, as of June 2010 Plaintiff seemed to be functioning fairly well, and there is no evidence subsequent to that time that would support a finding that Plaintiff persistently suffered a "marked" limitation in social functioning.

function at an appropriate pace or with persistence in social relations or work-related activities (*id.*, referencing tr. 344).  The ALJ gave Dr. Duffy's diagnosis and opinions little weight, finding "there is no evidence showing that [Plaintiff] complained of any paranoia or psychotic symptoms to any of her treating health care providers during the period of adjudication." (*id.*).

In support of this finding, the ALJ stated—correctly—that in April 2010 Plaintiff did not complain to Dr. Samanta of auditory or visual hallucinations, suspiciousness, or paranoia (tr. 23–24, 529).  The court notes, however, that the ALJ failed to acknowledge Dr. Samanta's comment that Plaintiff "might have some hint of paranoia there that she denies at this time" or Dr. Samanta's diagnosis of major depressive disorder *with* psychosis (tr. 529).  Nevertheless, as accurately noted by the ALJ, just two months later, in June 2010, when Plaintiff returned for a follow-up visit with Dr. Samanta, she reported that her medications were working well, and Dr. Samanta did not mention any symptoms of paranoia or psychosis; rather, Dr. Samanta described Plaintiff as being bright and cheerful and presenting herself well; increased her GAF from 45 to 55 to 60 to indicate the presence of only moderate symptoms; and changed Plaintiff's diagnosis to major depressive disorder *without* psychosis (tr. 24, 527).  The ALJ also correctly noted that Dr. Garg's treatment notes from June 2010 to October 2011 referenced Plaintiff's depression and anxiety but did not mention complaints or diagnoses of paranoia or psychosis (tr. 24, 556–98), and Plaintiff herself testified that she did believe she had a psychotic disorder (tr. 24, 58).  The court concludes that the reasons articulated by the ALJ are, on balance, sufficient to support her determination to give little weight to Dr. Duffy's March 2010 report, an opinion which in any event was not entitled to controlling weight in light of Dr. Duffy's status as a one-time examining consultant.[17]  *See* Crawford v. Comm'r of Social Security, 363 F.3d 1155, 1160 (11th Cir. 2004) (opinion of one-time examining consultant not entitled to great weight).

Finally, the court addresses Plaintiff's argument that, notwithstanding her purported reliance on the opinions of Dr. Cooper and Dr. Ruddock, the ALJ failed to include all of the functional

---

[17] In her April 2010 report, Dr. Samanta referenced Plaintiff's "last hospitalization . . . [when] she was getting paranoid to the point that she was thinking that people are stalking and watching her and the FBI is involved" (tr. 528). To the extent Plaintiff relies on this reference to refute the ALJ's statement that Plaintiff had not complained of paranoia or psychotic symptoms to her treating health care providers (doc. 17 at 19–20), her reliance is misplaced. The ALJ limited the reference to the period of adjudication, which commenced in September 2009, and the referenced "last [psychiatric] hospitalization" appears to have occurred in 2006 (tr. 528).

limitations they recommended in the mental RFC assessment or the questions posed to the VE (doc. 17 at 17–18), including that Plaintiff's ability to understand, remember, and carry out detailed instructions was impaired as was her ability to respond appropriately to criticism, work in close proximity to others, and interact with the general public (tr. 511).  According to Plaintiff, the ALJ's failure to incorporate all of these limitations into her mental RFC assessment and the hypothetical questions posed to the VE requires reversal and remand of this case (*id.* at 18).

The court is satisfied that the limitations imposed by the ALJ adequately take into consideration Dr. Cooper's and Dr. Ruddock's assessments.  The ALJ limited Plaintiff to jobs that did not involve a variety of instructions or tasks, required only simple one-to-two step instructions, included oral instructions with few concrete variables in or from standardized situations, and involved making only simple work-related decisions (tr. 26, 71).  Such a limitation should accommodate the consultants' finding that Plaintiff was moderately impaired in the ability to understand, remember, and carry out detailed instructions and to accept criticism.[18]  The ALJ also limited Plaintiff to positions that required no work in crowds, no more than occasional contact with the public, and only minimal changes in work setting and routines (*id.*).  This limitation should accommodate the consultants' finding that Plaintiff is moderately impaired in the ability to work in close proximity to others and interact with the general public.  Moreover, as stated by Dr. Cooper, the record as a whole is sufficient to show that Plaintiff "retains the ability to perform simple, repetitive tasks in spite of the limitations noted [in the report].  [Plaintiff] is able to meet the basic demands of work on a sustained basis despite any limitations resulting from identified [medically determined impairments]" (tr. 511).  For all of the foregoing reasons, the court finds no reversible error in the ALJ's consideration of the restrictions recommended by Dr. Cooper and Dr. Ruddock when she established Plaintiff's RFC and posed questions to the VE.

VII.    CONCLUSION

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed.  42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote, 67 F.3d at1560.

---

[18]  Even if, due to a moderately impaired ability to accept criticism, Plaintiff was limited to only occasional contact with supervisors and thus could not sustain the job of office helper (*see* VE's testimony at tr. 74–75), the court notes that the positions of assembler of electrical accessories and routing clerk would still be available to Plaintiff.

Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making her findings, or that any other ground for reversal exists.

Accordingly, it is **ORDERED** that the decision of the Commissioner is **AFFIRMED**, that this action is **DISMISSED,** and that the clerk is directed to close the file.

At Pensacola, Florida this 27th day of March 2015.


/s/ Elizabeth M. Timothy
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**